IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH A. CRUM, | ) | |
| Plaintiff, | ) | C.A. No. 06-250 Erie |
| | ) | |
| v. | ) | District Judge McLaughlin |
| | ) | Magistrate Judge Baxter |
| UNITED STATES OF AMERICA, et al., | ) | |
| Defendants. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.     RECOMMENDATION**

It is respectfully recommended that the United States' Motion for Summary Judgment [Document # 38] be granted.

**II.    REPORT**

    **A.     Procedural History**

On October 24, 2006, Plaintiff Joseph A. Crum, an inmate formerly incarcerated[1] at the Federal Correctional Institution at McKean in Bradford, Pennsylvania ("FCI-McKean"), originally filed this *pro se* civil rights action pursuant to <u>Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), and the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 2671, <u>et</u> <u>seq</u>. Named as Defendants in Plaintiff's original Complaint were: Dennis Olson, M.D. ("Olson"), Clinical Director at FCI-McKean; Walter L. Rhinehart ("Rhinehart"), Chief Psychologist at FCI-McKean; Jimmie S. Ward ("Ward"), Physician Assistant at FCI-McKean; Scott Dodrill ("Dodrill"), Regional Director of the Federal Bureau of Prisons ("BOP"); Henry J. Sadowski ("Sadowski"), Regional Counsel at the BOP; and James F. Sherman ("Sherman"), Warden at FCI-McKean. (Hereinafter collectively referred to as

---

1. Plaintiff is currently incarcerated at FCC Forrest City, Medium, located in Forrest City, Arizona.

"individual Defendants").

Plaintiff alleged in his original Complaint that the individual Defendants were negligent and/or violated his Fifth Amendment due process rights and his Eighth Amendment right to be free from cruel and unusual punishment, as follows: (i) Defendant Olson "prescribed the wrong medication, which caused fatal side effects to [Plaintiff's] immune system, and injury to his white blood cells;" (ii) Defendant Ward "failed to provide medical attention to [Plaintiff's] serious medical needs;" (iii) Defendant Rhinehart "failed to provide mental health services for the emotional duress and mental anguish [Plaintiff] was suffering from;" and (iv) Defendants Sherman, Dodrill, and Sadowski "acted with deliberate indifference to [Plaintiff's] serious medical needs by failing to correct the actions of their prison staff, after being notified of various problems through prison grievances."

In response to the original Complaint, Defendants filed a motion to dismiss or, in the alternative, motion for summary judgment [Document # 19], arguing, *inter alia*, that: (i) Plaintiff's claims should be limited to the allegation that there was a delay in providing him with medical care at FCI McKean, because he failed to exhaust his administrative remedies with regard to his other claims; (ii) all Defendants should be dismissed because Plaintiff cannot demonstrate "deliberate indifference;" and (iii) Plaintiff's FTCA claims should be dismissed because the United States is the only proper party to an FTCA action.

On May 21, 2007, Plaintiff filed a memorandum of law in opposition to Defendants' motion [Document # 22], as well as an Amended Complaint, asserting his FTCA claim against the United States of America ("United States"), who was added as a Defendant in this case. [Document # 23]. In response to Plaintiff's Amended Complaint, Defendant United States filed an Answer. [Document # 27].

On February 27, 2008, this Court issued a Report and Recommendation recommending that the individual Defendants' motion to dismiss, or in the alternative, motion for summary judgment, be granted. [Document # 31]. This recommendation was adopted by Memorandum

Order of District Judge Sean J. McLaughlin, dated March 18, 2008, as a result of which the individual Defendants were dismissed from this case. The only claims remaining in this case are Plaintiff's FTCA claims against the United States, which are summarized by Plaintiff, as follows: "The United States of America owed Plaintiff a duty of care and [the individual Defendants] breached this duty when harm of being prescribed the wrong medication caused fatal side effects which resulted in Plaintiff's white blood cells being abnormal and injured, also [the individual Defendants] denied Plaintiff mental health care when Plaintiff was informed of possibly being HIV positive by Defendants." (Document # 23, Amended Complaint, at ¶ 3).

On August 15, 2008, the United States filed a motion for summary judgment, and brief in support thereof, arguing that (i) Plaintiff failed to exhaust his administrative tort remedies with regard to any claim other than his claim that he was prescribed the wrong medication, which resulted in allegedly harmful side effects; and (ii) Plaintiff's claim regarding the prescription of the wrong medication fails because: (a) Plaintiff has failed to provide any expert report or testimony; (b) Plaintiff cannot establish a breach of the applicable standard of care; and/or (c) Plaintiff cannot establish a causal connection between the alleged breach and any claimed injury. [Document ## 38, 39]. Plaintiff filed a brief in opposition to the United States' motion on September 24, 2008 [Document # 44], the United States filed a reply brief on November 21, 2008 [Document # 51], and Plaintiff filed a sur-reply on December 31, 2008 [Document # 53]. This matter is now ripe for consideration.

**B.     Relevant Factual History**

Plaintiff was designated to FCI McKean to serve a portion of his sentence from August 11, 2005, until his transfer to another correctional facility on January 19, 2006. (Id. at p. 1). Prior to his designation to FCI-McKean, Plaintiff was incarcerated at FCI-Raybrook, New York. While at FCI-Raybrook, Plaintiff had been diagnosed with degenerative cervical spondylosis, and was taking Naproxen, 550 mg, one pill, twice a day. (See Declaration of Victor Loranth,

M.D., Clinical Director at FCI Williamsburg, attached as Exhibit 5 to Document # 39 ("Loranth Declaration"), at ¶ 2a). Upon his arrival at FCI-McKean on August 11, 2005, Plaintiff informed Ward that he had pain in his right shoulder, lower back, and head, which fluctuated with his body position and movements, and he noted that Naproxen was effective in controlling his pain. Plaintiff was diagnosed with chronic lower back pain, headaches, and chronic right shoulder pain, and was added to FCI-McKean's Chronic Care Clinic so that his cervical spine stenosis could be monitored. (Id. at ¶¶ 2b-c).

On September 16, 2005, Plaintiff complained to Olson of chronic aching pain in his right shoulder and arm, which increased with abduction. On examination, tenderness was noted in Plaintiff's anterior deltoid region, but he had full range of motion and muscle strength. He was assessed with cervical spine stenosis, and was issued a sneaker pass, an extra mattress pass, and a work restriction. In addition, Naproxen was discontinued, and Indomethacin and Tegretol was prescribed for pain. (Id. at ¶ 2d). On September 22, 2005, Plaintiff again reported problems with his right shoulder, indicating that he injured his shoulder in 2002 and that his pain level was a 10 on a scale of 1 to 10. On examination, Plaintiff was found to have full range of motion, with some stiffness and tenderness, but with normal strength in his extremity. He was assessed with bicipital tendinitis, post-trauma right cuff arthritis, and tension headaches. (Id. at ¶ 2e).

On October 19, 2005, Plaintiff complained that he was suffering from shoulder and left lower back pain. He also complained that his medication was not helping, and requested an MRI to determine what was causing the pain. (Id. at ¶ 2j). In response to Plaintiff's MRI request, Ward noted that Plaintiff had a history of chronic right shoulder pain with no recent or acute trauma, and that x-rays had only shown degenerative changes. In addition, Ward noted that examination of Plaintiff's right shoulder was benign with no subluxation and complete range of motion without difficulty, and normal strength. For these reasons, Ward found that no MRI was needed and, after consultation, Olson agreed. (Id. at ¶ 2k).

On November 9, 2005, Plaintiff complained of kidney and liver pain and requested laboratory tests. Because Plaintiff had a history of seizures, with no recent blood work, laboratory tests were ordered. (Id. at ¶ 2o). On November 16, 2005, a complete metabolic liver profile was conducted, which indicated, *inter alia*, that Plaintiff's white blood cell count was low at 2.8 (ref. range 4.3 - 11.1), which indicated mild leukopenia. After reviewing the results of Plaintiff's liver profile, Olson noted that the results may have been caused by the use of Tegretol and he, thus, discontinued Tegretol and ordered a re-check of Plaintiff's white blood cell count. (Id. at ¶ 2p).

On December 8, 2005, blood samples were taken from Plaintiff for evaluation, which revealed a low white blood cell count of 3.2 (ref. range 4.3 - 11.1). (Id. at ¶ 2r). On December 12, 2008, Olson reviewed the blood sample results and noted that Plaintiff's white blood cell count was 3,200 (3.2), down from 3,300 (3.3) on March 27, 1996. He also saw Plaintiff in the Chronic Care Clinic, at which time Plaintiff said that his kidneys were bothering him, and that he had a backache with urination. Plaintiff was assessed with cervical spine stenosis; reduced white blood cell count, improved, with a noted history of chronic reduced white blood cell count; and rule out renal pathology.[2] Plaintiff was educated about his condition, laboratory work was ordered, and Plaintiff was ordered to follow-up in the Chronic Care Clinic in four months. (Id. at ¶ 2r-s).

---

[2]

Plaintiff's medical records indicate the following white blood cell counts on the following dates:

| Date | White Blood Cell Count |
| --- | --- |
| June 19, 1996 | 2.9 (ref. range 4.0 - 10.6) |
| July 6, 2000 | 3.7 (ref. range 3.5 - 10.5) |
| November 16, 2005 | 2.8 (ref. range 4.3 - 11.1) |
| December 8, 2005 | 3.2 (ref. range 4.3 - 11.1) |
| March 22, 2006 | 3.1 (ref. range 4.3 - 11.1) |
| June 5, 2006 | 2.1 (ref. range 4.3 - 11.1) |
| November 13, 2006 | 3.3 (ref. range 4.3 - 11.1) |

(See Plaintiff's Prison Medical Records, Exhibit 2a attached to Document # 20, at pp. 47, 43, 36-37, 33, 27, 24).

On January 4, 2006, Plaintiff complained to a physician assistant about multiple chronic problems. On examination, Plaintiff was assessed with degenerative joint disease; cervical spine stenosis and arthritis; overuse syndrome/arthritis; decreasing distance vision, rule out myopia; tension headaches per right upper extremity/cervical spine - degenerative joint disease; stenosis/ arthritis; hemorrhoids; kidney/liver complaints. Plaintiff was educated and counseled regarding pathology of his conditions and the treatment plan; he was directed to use moist heat compresses as directed; he was prescribed hydrocortisone suppositories and Naproxen; and an eye doctor referral was made. (Id. at ¶ 2w).

On January 17, 2006, Plaintiff complained to a physician assistant about chronic lumbo sacral back pain and left lower back pain that was at a level of 4-6 on a 1-10 pain scale. Plaintiff stated that Naproxen did not help and wondered if it worsened his discomfort. Plaintiff was told to follow-up in the Chronic Care Clinic, Naproxen was discontinued, and Tylenol was prescribed. (Id. at ¶ 2x). Later the same day, the physician assistant noted that Plaintiff was to be transferred from FCI McKean the next day and, since Tylenol was not deemed necessary, it was discontinued. (Id. at ¶ 2y).

### C. Standards of Review

#### 1. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine as to any material fact and that the moving party is entitled to a judgment as matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(non-movant must present

6

affirmative evidence-more than a scintilla but less than a preponderance-to support his claims). When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002) quoting Battaglia v. McKendry, 233 F.3d 720, 722 (3d Cir. 2000). Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements, rather, "the party opposing the motion must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." In re Ikon Office Solutions, 277 F.3d 658, 666 (3d Cir. 2002).

On a motion for summary judgment, the district court may not weigh the credibility or weight of the evidence, rather, it may only determine the existence of a triable issue of fact. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### 2. *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" Haines v. Kerner, 404 U.S. 519, 520-521(1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the

complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same). Because Plaintiff is a *pro se* litigant, this Court will consider facts and make inferences where it is appropriate.

### D. Subject Matter Jurisdiction and the Federal Tort Claims Act

The Federal Tort Claims Act (FTCA) grants jurisdiction to the federal courts to hear suits against the United States Government for torts committed by its employees while in the scope of their employment. See 28 U.S.C. § 2675(a). The FTCA allows federal inmates to sue the United States for injuries sustained while incarcerated. 28 U.S.C. § 2674. The FTCA specifically requires an initial presentation of the claim to the appropriate federal agency and a final denial by the agency as a non-waivable prerequisite to the filing of the lawsuit. See Deutsch v. United States, 67 F.3d 1080, 1091 (3d Cir. 1995). This requirement is set forth in 28 U.S.C. § 2675(a)[3]:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office of employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

Thus, presentation of an administrative claim in accordance with 28 U.S.C. § 2675(a) is

---

[3] Prior to 1996, FTCA claimants had the option of filing suit in federal court without first presenting their claims to the appropriate federal agency. Because the vast majority of these claims were ultimately settled before trial, however, the Department of Justice proposed that Congress amend the FTCA to "requir[e] all claims to be presented to the appropriate agency for consideration and possible settlement before a court action could be instituted. This procedure would make it possible for the claim first to be considered by the agency whose employee's activity allegedly caused the damage.... Since it is the one directly concerned, it can be expected that claims which are found to be meritorious can be settled more quickly without the need for filing suit and possible expensive and time-consuming litigation." S.Rep. No. 1327, 89th Cong., 2d Sess., 3 (1966), U.S. Code Cong. & Admin. News 1966, pp. 2515, 2517.

8

"a jurisdictional requirement and an absolute prerequisite to maintaining a civil action against the government under the FTCA." Valenzuela v. Thrifty Rent-A-Car, 1995 WL 708109, at *3 (E.D.Pa. Nov. 20, 1995). See also McNeil v. United States, 508 U.S. 106 (1993)(FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies); Livera v. First Nat. State Bank, 879 F.2d 1186, 1194 (3d Cir. 1989)(Exhaustion of administrative remedies is a jurisdictional requirement that cannot be waived and must be strictly construed).

Here, the United States contends that Plaintiff has failed to exhaust his administrative tort remedies with regard to any claims other than his claim that Olson prescribed him the wrong medication, which caused his white blood cell count to decrease. In support of this contention, the United States has submitted the Declaration of Rosalind Bingham, a Paralegal Specialist with the Federal Bureau of Prisons' Northeast Regional Office ("Bingham Declaration"), who declares, in pertinent part, as follows:

> 10. On March 16, 2007, I accessed the administrative tort claim records for the administrative tort claims filed by inmate Joseph Crum, Reg. No. 31353-037, with respect to any of the issues alleged in this civil action. Based upon my search of inmate Crum's administrative tort claims, I determined he filed one tort claim with respect to the issues raised in this civil action. Specifically, on December 15, 2005, he filed Administrative Tort Claim Number 398655 with the Federal Bureau of Prisons Northeast Regional Office. His claim alleged that from September 16, 2005, through December 12, 2005, he was subjected to medical negligence. He alleged that Defendant Olson prescribed him the wrong medication, and this caused his white blood cell count to decrease. He alleged that he experienced side effects to his eye sight, bones, joints, abdomen, kidney, liver and brain. He also alleged he suffered from a loss of appetite and chills and a fever. As relief, he requested two million dollars. Absent from the tort claim were the following allegations: (1) Defendant Ward placing him in fear of being HIV positive or failing to refer him for psychological treatment; (2) failure or refusal by Defendant Rhinehart to render psychological treatment for symptoms of depression; and/or (3) failure of Defendants Dodrill, Sadowski, or Sherman to correct alleged problems with his medical treatment....
>
> 11. Based upon my review of inmate Crum's administrative tort claim records, I have determined that to date, he has not

> exhausted his available administrative remedies under the
> Federal Tort Claims Act for the following issues: (1) whether
> Defendant Ward placed him in fear of being HIV positive or
> failing to refer him for psychological treatment; (2) whether
> Defendant Rhinehart failed or refused to render psychological
> treatment for symptoms of depression; and/or (3) whether
> Defendants Dodrill, Sadowski, and/or Sherman failed to correct
> the alleged problems with his medical treatment.

(See Bingham Declaration attached as Exhibit 1 to Document # 40, at ¶¶ 10-11).

In response, Plaintiff simply asserts that he "has infact [sic] exhausted all administrative remedies to each of his claims stated herein." (Document # 44, Opposition Brief, at p. 1). However, Plaintiff has failed to submit any evidence to support this assertion. Thus, the only evidence before this Court regarding exhaustion of Plaintiff's administrative tort claim(s) is the Bingham Declaration and a copy of the actual administrative tort claim that was filed by Plaintiff, which is attached as Exhibit 1d to the United States' exhibits in support of their motion for summary judgment. [Document # 40]. After reviewing the administrative tort claim of record, this Court agrees with Ms. Bingham that the only claim for which Plaintiff has exhausted his administrative tort remedies under the FTCA is his claim that Olson prescribed the wrong medication, which allegedly caused him to suffer several "fatal side effects." (Document 40, Exhibit 1d, at ¶ 8). All other FTCA claims, to the extent Plaintiff has asserted the same, have not ben properly exhausted under the FTCA and summary judgment should be granted in favor of the United States with regard to such claims.

### E.     Discussion

With regard to Plaintiff's remaining FTCA claim, Plaintiff claims that Olson negligently prescribed Tegretol to manage his pain, which allegedly caused his white blood count to decrease to the point where he was diagnosed with a mild case of leukopenia. The medical record reflects that, upon noticing the decrease in Plaintiff's white blood cell count, Dr. Olson discontinued the Tegretol and prescribed new pain medication. The medical record further reflects that Plaintiff's white blood cell count rose steadily thereafter until it returned to within

10

normal range. Nevertheless, Plaintiff claims that the decrease in his white blood cell count attributed to Olson's allegedly negligent prescription of Tegretol caused him to suffer the following injuries: lower back pain; pain in the middle of his stomach; headaches; blurred vision; fatigue; burning upon urination; pain in his liver and kidney areas; loss of appetite; and aching joints.

The United States contends that it should be granted summary judgment because Plaintiff has failed to provide any expert report or testimony in support of his claim. This Court agrees.

In general, substantive state law governs an FTCA claim. 28 U.S.C. § 1346(b)(1); Sosa v. Alvarez-Machain, 542 U.S. 692, 700 (2004). Because FCI McKean is located in Pennsylvania, the United States' liability in this action is governed by the law of medical malpractice in Pennsylvania. See, e.g., Wooding v. United States, 2007 WL 951494 at * 3, n. 6 (W.D.Pa. Mar. 27, 2007). Under Pennsylvania law, a plaintiff must make four showings to establish a *prima facie* case of medical malpractice: (1) a duty owed by the physician; (2) a breach of that duty; (3) that the breach proximately caused harm; and (4) that the damages directly resulted from the harm. Quinby v. Plumstead Family Practice, Inc., 589 Pa. 183, 907 A.2d 1061, 1070 (2006)(citation omitted). In addition, "as a general rule, a plaintiff has the burden of presenting expert opinions that the alleged act or omission of the defendant physician or hospital personnel fell below the appropriate standard of care in the community, and that the negligent conduct caused the injuries for which recovery is sought." Simpson v. Federal Bureau of Prisons, 2005 WL 2387631 at * 5 (M.D.PA. Sept. 28, 2005)(citation omitted). The only exception to this requirement is "where the matter is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons.'" Simpson, 2005 WL 2387631 at * 5, quoting Hightower-Warren v. Silk, 548 Pa. 459, 698 A.2d 52, 54 n. 1 (Pa. 1997).

The Pennsylvania Supreme Court's cautionary language in Toogood v. Rogal, 573 Pa.

11

245, 824 A.2d 1140, 1149 (Pa. 2003), illustrates the narrowness of the exception to the requirement of expert testimony:

> Courts sitting in medical malpractice cases require detailed expert testimony because a jury of laypersons generally lacks the knowledge to determine the factual issues of medical causation; the degree of skill, knowledge, and experience required of the physician; and the breach of the medical standard of care. In contrast, plaintiffs in *res ipsa loquitur* cases rely on the jury to fill in the missing pieces of causation and negligence, inherent in their cases, with the jury's common experience. Determining whether there was a breach of duty, however, involves a two-step process; the court must first determine the standard of care; it then must examine whether the defendant's conduct measured up to that standard. **Not only does the plaintiff have the burden of proving that the defendant did not possess and employ the required skill and knowledge, or did not exercise the care and judgment of a reasonable professional, he or she must also prove that the injury was caused by the failure to employ that requisite skill and knowledge. We have previously concluded that this must be accomplished with expert medical testimony presented at trial by doctor's testifying as expert witnesses.**
>
> ***Res ipsa loquitur* must be carefully limited, for to say whether a particular error on the part of a physician reflects negligence demands a complete understanding of the procedure the doctor is performing and the responsibilities upon him at the moment of injury.** Thus, in evaluating a doctor's decision to administer a nerve block injection in a particular location, an intelligent jury analysis requires some understanding of the results of giving the injection in various places; the skill required in pinpointing a specific location; and the likelihood of giving the injection in an unintended site. **We affirm our earlier conclusion, set forth in numerous decisions of this Court that, medicine being an applied science, the realm of reasonable choice is best defined by those engaged in the practice, and expert medical testimony on the issue is required.** As aptly noted by the Justices of the Supreme Court of New Mexico, 'The cause and effect of a physical condition lies in a field of knowledge in which only a medical expert can give a competent opinion.... [Without experts] we feel that the jury could have no basis other than conjecture, surmise or speculation upon which to consider causation.' *Woods v. Brumlop*, 71 N.M. 221, 277 P.2d 520, 523 (1962).

(Footnotes omitted)(emphasis added).

Here, Plaintiff concedes that he "has yet to produce an expert report or otherwise identify an expert who will testify in support of his medical malpractice claims," despite having "done every thing there is to seek a [sic] expert witness." (Document # 44, Plaintiff's Opposition Brief,

at p. 2). Nevertheless, Plaintiff argues that "the acceptable professional standard for prescribing medication is within a lay person's common knowledge such that Doctor Olson's negligence can be determined without the benefit of the specialized knowledge of experts, Doctor Olson's careless acts are quite obvious, so there should be no expert testimony required...." (Id. at p. 16). Plaintiff then endeavors to refute the opinion of the United States' medical expert[4] with information he has obtained from a medical textbook entitled "The American College of Physicians, Complete Home Medical Guide," which apparently discloses the content, recommended usage, and potential risks and side effects of various prescription medications, including Tegretol. (Id. at p. 6). However, the mere fact that Plaintiff has found it necessary to resort to a medical textbook to support his claim is a clear indication that the act of prescribing medication is more than a "simple matter" that would fall within the realm of a jury's "common experience." Moreover, a lay person's interpretation of information obtained from a medical textbook is hardly sufficient to overcome the opinion of a medical expert.

Yet, even if Plaintiff's reliance on a medical textbook is deemed sufficient to show that Olson breached his standard of care by prescribing "the wrong medication," there is nothing in the record before this Court, other than Plaintiff's speculation, to establish the necessary causal connection between Plaintiff's use of Tegretol for a closed period of three months and the litany of injuries Plaintiff claims to have suffered as a result. To establish such a connection, expert medical testimony is required. Plaintiff has failed to supply this expert testimony.[5] As a result,

---

[4]

The United States has submitted the expert report of Joseph Conigliaro, MD, MPH, a board-certified Internist with experience regarding prescription medications, who opines that "[i]f the [Tegretol] was associated with the mild leukopenia it was appropriately detected and no clinical consequences arose from it. There is no evidence to suggest that [Plaintiff] suffered any harm as a result of this as evidenced by an examination and evaluation from a hematologist and his [white blood count] returning to normal.... In my experience most practitioners would have handled this case in the same way." (Conigliaro Report attached as Exhibit 4 to Document # 40, at p. 2).

[5]

Plaintiff appears to recognize that expert testimony is necessary because he has requested this Court to appoint a medical expert to perform an independent medical evaluation of him. (Document # 44, Plaintiff's Opposition Brief, at p. 3). However, while Rule 706 of the Federal Rules of Evidence grants a court discretion to appoint an

13

summary judgment should be entered in favor of the United States on Plaintiff's remaining FTCA claim. See Wooding, 2007 WL 951494 at * 5 (granting summary judgment in favor of the United States due to Plaintiff's failure to supply expert medical testimony); Borja v. United States, 2006 WL 3042962 at * 9 (M.D.Pa. Oct. 24, 2006)(finding Plaintiff unable to establish *prima facie* case of medical malpractice due to absence of expert medical evidence); Lane v. Riley, 2005 WL 3454401 at * 3 (W.D.Pa. Nov. 22, 2005)(finding expert medical testimony necessary to establish causation).

## III. CONCLUSION

For the foregoing reasons, it is respectfully recommended that the United States' Motion for Summary Judgment [Document # 38] be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of some appellate rights. See, e.g., Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief U.S. Magistrate Judge

Dated: February 17, 2009

cc: The Honorable Sean J. McLaughlin
United States District Judge

---

independent expert to aid the court, such discretion is not intended to be used to assist a party who has failed to obtain an expert of his own. See Kerwin v. Varner, 2006 WL 3742738 at * 2 (M.D.Pa. Dec. 15, 2006). "A trial judge does not abuse his discretion in declining to appoint an independent expert solely to benefit a party who has otherwise failed to gather such evidence as would suffice to overcome summary judgment." Ford v. Mercer County Correctional Ctr., 171 Fed. Appx. 416, 420 (3d Cir. 2006). Because Plaintiff seeks appointment of a medical expert for his own benefit, his request must be denied.